IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMIE C. ROMERO | ) | |
| | ) | |
| Plaintiff, | ) | No. 24 C 10864 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| OFFICER JOHN B. FORLENZA, the | ) | |
| LAKE COUNTY SHERRIFF'S OFFICE, and | ) | |
| LAKE COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Jamie Romero brings this three-count complaint against defendants Officer John Forlenza ("Forlenza"), the Lake County Sheriff's Office ("LSCO"), and Lake County, Illinois. Count I alleges that Forlenza used excessive force against plaintiff. Count II is a Monell claim that alleges that plaintiff was injured as a result of the LSCO's policy, practice, or custom of permitting canines to bite and hold individuals who are not fleeing and do not pose a threat of great bodily harm to others. Count III is an indemnity claim against Lake County, Illinois for any damages owed to plaintiff by Forlenza or the LSCO. Defendants move for summary judgment on all three counts (Doc. 46). For the reasons below, the motion for summary judgment is denied.

## BACKGROUND

On December 31, 2023, plaintiff was arrested for battery by Island Lake Police. After complaining of chest pain, he was transported to Good Shephard Hospital, where he received some treatment. Hoping to make it to Las Vegas, plaintiff decided to leave the hospital. Wearing a tank top, sweat pants, and sandals, plaintiff simply walked out.

1

After wandering in the cold night, plaintiff arrived at the Lake County Orthopedics building, located about a quarter mile from Good Shephard Hospital.  Plaintiff needed to use the restroom and was hoping to find a telephone to contact his brother, his wife, or someone who could help him get to the airport and back to Las Vegas.  The second door that plaintiff tried was unlocked, and he entered the building.  Inside, he found a working phone on the reception desk and tried calling his brother and his wife, but no one answered.  At that point, plaintiff did not have a plan.  He sat down in the lobby waiting for the sun to come up and hoping he would figure something out.  Plaintiff testified that he knew he was going to be apprehended.

Meanwhile, Forlenza and his canine were searching for plaintiff.  Plaintiff had an active warrant (unrelated to the battery) that identified him as armed and dangerous.  Forlenza received information that an alarm tripped at the Lake County Orthopedics building.  He arrived there with his canine, Dax, and his partner, Deputy McCarty.

Entering on the south side of the U-shaped one-story building, Forlenza and McCarty searched for plaintiff.  Forlenza kept his canine on a leash.  Forlenza announced his presence and warned plaintiff to surrender or else he would release the dog to search and that the dog would bite.  Plaintiff states that he heard the officers' presence but not Forlenza's announcement. Body-worn camera ("BWC") footage shows that the warning was barely audible over the loud barking of the canine.  According to plaintiff, he did not want to run because he feared being tasered, shot, or bitten.  So, plaintiff just stood in a hallway on the north side of the building, waiting for the officer to apprehend him.[1]

---

[1] It is unclear from the record when plaintiff moved from the lobby to the hallway where he was found, which was about a 20-second walk from the lobby.  Forlenza and McCarty arrived at the lobby approximately two minutes into their search, so presumably plaintiff moved to the hallway where he was found prior to that.

2

Forlenza, his canine, and McCarty searched various rooms and corridors in the south and center sections of the building for approximately 10 minutes. After shifting his attention to the north section of the building, Forlenza rounded a corridor corner and saw plaintiff. According to Forlenza, as he rounded the corner his canine was already attempting to "apprehend" plaintiff.

As the BWC footage makes clear, canine "apprehension" is quite brutal. The canine executed what Forlenza terms as a "bite and hold." The canine bit Forlenza multiple times, at least once in the left quadricep and multiple times in his right lower leg. The BWC shows that plaintiff was standing against the wall in a well-lit area with his hands visible. Plaintiff's first words were "ow" and "I didn't do anything." He repeated these several times as the dog bit him. Forlenza then brought plaintiff down to the ground. About ten seconds after the biting began, Forlenza or McCarty ordered "hands behind your back," to which plaintiff responded "okay, okay, okay." This was followed by a series of plaintiff's exasperated cries of "ow, ow, ow" as the canine bit plaintiff's lower right leg multiple times.

At this point, about 15 seconds into the biting, BWC footage shows that Forlenza placed his left hand on plaintiff's right ankle, essentially holding plaintiff's leg in place, allowing the canine to secure its bite deeper into plaintiff's leg. McCarty ordered plaintiff to put his other hand behind his back, to which plaintiff replied "yes, yes, yes, I'm sorry." For the next twenty seconds, as plaintiff yelled in agony, the canine held the bite against plaintiff's writhing. At some points, while holding its bite into plaintiff's leg, the canine tugged and shook its head in a motion familiar to anyone who has ever seen a dog play tug of war with a chew toy. About seven seconds after McCarty confirmed that plaintiff was cuffed, he ordered the canine to release the bite, which it did. The duration of the biting was approximately 42 seconds.

**LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden, and the court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in their favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. Rather, the nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

In addition, here the record contains BWC footage from both officers involved in plaintiff's apprehension. Generally, the existence in the record of footage capturing the events in question does not change these applicable standards. But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Rather, the court should "view[ ] the facts in the light depicted by the videotape." Id. at 381. Put simply, "a video record of the events at issue can evaporate any factual dispute that would otherwise exist." United States v. Norville, 43 F.4th 680, 682 (7th Cir. 2022).

**DISCUSSION**

Defendants' argument for summary judgment is straightforward: the use of force was reasonable. Thus, the §1983 claim fails, the Monell claim fails, and the indemnity claim fails. In evaluating the reasonableness of the use of force here, defendants urge the court to focus on the

4

following specific facts.  First, plaintiff was arrested twice, including for an aggravated domestic battery, which is a forcible felony offense.  Second, plaintiff escaped from custody.  Third, there was a warrant for plaintiff that identified him as armed and dangerous.  Fourth, plaintiff had the time and opportunity to arm himself.  Fifth, plaintiff placed himself around a corner and was lying in wait in an area that deprived police of a line of sight.  Sixth, the apprehension took place in a fraction of a second.  Defendants argue that the court should compare these facts favorably to the facts in Johnson v. Scott, 576 F.3d 658 (7th Cir. 2009), a Seventh Circuit case that approved the use of a police canine in apprehending a fleeing suspect after he surrendered. Defendants also argue that these facts satisfy the standard for reasonable use of force laid out in Graham v. Connor, 490 U.S. 386, 396 (1989).  In addition, defendants argue that Officer Forlenza enjoys qualified immunity.

Plaintiffs responds by arguing that Johnson v. Scott does not control this case.  Plaintiff argues that the court should evaluate the reasonableness of the use of force in light of the fact that he was subdued and complying with the officers' orders.  Plaintiff contends that there are questions of fact as to whether plaintiff was given a chance to surrender because Forlenza's warning was inaudible and as to whether Forlenza could have pulled the dog back or issued an oral command to plaintiff instead.  Plaintiff also argues that Forlenza does not enjoy qualified immunity because his use of excessive force violated a clearly established right.  Lastly, plaintiff argues that the LSCO had a policy of deploying canines to perform a "whole mouth bite that gains compliance by pain."  Thus, plaintiff argues that the Monell claim should survive because he was a victim of excessive force due to the policy, practice, or custom of the LCSO.

In the context of an arrest, excessive force claims are reviewed under the Fourth Amendment's "reasonableness" standard.  Graham v. Connor, 490 U.S. 386, 394 (1989).  The

5

determination of whether a particular use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (internal quotations omitted). The Fourth Amendment's reasonableness standard is objective, it asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.

Some factors that are helpful in analyzing whether a use of force was reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. But these three factors are not exhaustive. The "proper application" of the objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case." Id.; see also Cyrus v. Town of Mukwonago, 624 F.3d 856, 861–62 (7th Cir. 2010) (explaining that the inquiry requires examination of "the totality of the circumstances"); Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (noting that the Court in Graham "did not, however, limit the inquiry to those [three] factors").

In cases involving the use of police dogs, courts also often weigh the following factors: (1) whether the officer warned the subject that he would deploy the dog; (2) the degree of control the officer maintained over the dog; (3) whether the officer terminated the dog bite within a reasonable amount of time; and (4) whether alternative tactics reasonably were available. Becker v. City of Evansville, No. 12-CV-182, 2015 WL 328895, at *6 (S.D. Ind. Jan. 26, 2015) (collecting cases), aff'd and remanded sub nom. Becker v. Elfreich, 821 F.3d 920 (7th Cir. 2016).

When reviewing excessive force claims, courts must keep in mind that "law-enforcement officers must make critical, split-second decisions in difficult and potentially explosive situations." Cyrus, 624 F.3d at 861–62 (7th Cir. 2010). Thus, courts must evaluate excessive force claims "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

The Seventh Circuit has cautioned that "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." Cyrus, 624 F.3d at 862. That caution is well-taken here. The court finds that this case is replete with disputed questions of material fact. With reference to the factors discussed above, the court will identify the material factual disputes in the record that preclude it from granting summary judgment.[2]

## A. Level of Force

A reasonableness inquiry in an excessive-force case begins by evaluating the nature and quality of the intrusion on plaintiff's Fourth Amendment interests. Cyrus, 624 F.3d at 861. Because the reasonableness inquiry must be conducted from the perspective of an officer on the scene, the court cannot conduct this analysis retrospectively based on the injuries that plaintiff ultimately suffered. Instead, the court must evaluate the nature and quality of the intrusion on plaintiff's Fourth Amendment interests by evaluating the level of force that the officer chose to employ.

---

[2] Defendants include a "Motion to Bar Expert Patrick J. McGee" as an exhibit to their Local Rule 56.1(a) statement of indisputable material facts. The court will not rule on it because it is not a properly filed motion. Nevertheless, the court's review of the record does not include materials from Mr. McGee.

It is undisputed that Forlenza used his canine, Dax, to conduct a "bite and hold" on plaintiff. But it is unclear from the record whether the use of Dax to "bite and hold" constituted deadly force or a lesser degree of force. As the Seventh Circuit observed in <u>Becker v. Elfreich</u>, 821 F.3d 920, 926–27 (7th Cir. 2016), "whether a bite and hold technique constitutes deadly force depends on how the dog is trained to behave when confronting a suspect." (internal quotations omitted). The record shows that "Dax was trained to immobilize offenders by biting and gaining pain compliance," but there is no more information on how Dax was trained to behave when confronting a subject. Thus, the level of force employed by Forlenza is uncertain. The reasonableness inquiry requires determining "whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake." <u>Jacobs v. City of Chicago</u>, 215 F.3d 758, 773 (7th Cir. 2000). The court cannot conduct this balancing as a matter of law, as defendants' motion for summary judgment requests, when one side of the balance remains factually uncertain.

**B. Immediate Threat/ Resisting or Actively Fleeing**

The court finds that it is disputed whether plaintiff posed an immediate threat to the safety of the officers or others and whether plaintiff was resisting or actively fleeing. The record contains facts that support the conclusion that plaintiff posed an immediate threat. First, it is undisputed that Forlenza knew that plaintiff had escaped custody from his arrest for strangling and battering his girlfriend, which is a forcible felony offense. The violent nature of the offense itself suggests that plaintiff could pose a threat to the safety of others. Second, plaintiff had an active warrant—unrelated to this arrest—that identified plaintiff as "armed and dangerous." Third, Forlenza was also told by the dispatcher that plaintiff "may fight police." Finally, plaintiff had, of course, fled the hospital an hour prior to being apprehended.

But there are other facts in the record that undercut the conclusion that plaintiff posed an immediate threat and that he was "actively" fleeing or resisting. Forlenza knew that plaintiff had just escaped from police custody in the hospital, where presumably he would have been searched for weapons (though Forlenza stated that he did not have any information as to whether plaintiff had been searched for weapons). According to plaintiff, when he fled the hospital, he was wearing only a tank top, sweat pants and sandals and had no other possessions on his person. Forlenza's partner, McCarty, testified that prior to the encounter with plaintiff, he had seen video footage of plaintiff leaving the hospital "wearing a gray tank top and gray sweatpants" and that plaintiff did not have anything in his hands. It is unclear from the record whether Forlenza also saw this video or if McCarty communicated this information to Forlenza.

Forlenza argues that in the hour between plaintiff leaving the hospital and being apprehended at the Lake Country Orthopedics building, plaintiff could have armed himself. But Forlenza was told by the Lake County Orthopedics building manager, who viewed the building's video remotely, that a male with a similar description to plaintiff had entered the building and that the person did not have anything in his hands when he entered. Despite this, Forlenza maintains that plaintiff "could have obtained a blunt object" after entering the building. In his deposition, Forlenza testified that what he felt "would be the most threatening was light dumbbells" that he saw at the facility. A reasonable jury could find this to be a rather speculative basis to conclude that plaintiff was armed. Cf. Becker, 821 F.3d at 927 (observing that "there was no evidence that Becker was still armed at the time officers executed the arrest warrant" despite the arrestee having committed a crime with a weapon weeks earlier).

Beyond these background facts is the confrontation with plaintiff itself, which was captured by the officers' BWCs. When plaintiff first appears in Forlenza's BWC footage, he is

9

leaning against a wall in a well-lit area with his hands visible. In his deposition, plaintiff testified that he knew his apprehension was inevitable and he was waiting there to be found by the officers. The canine, trotting a few feet ahead of Forlenza, made first contact with plaintiff. Plaintiff did not run or make any significant movements, remaining standing against the wall with his hands visible and in front of him.

Crucially, the record shows that Forlenza's evaluation of whether plaintiff posed an immediate threat was based almost entirely on the background information discussed above. Forlenza testified that "[w]hen we rounded the corner, simultaneously, I saw [plaintiff] as Dax was attempting to apprehend him." Forlenza also testified that he "had no opportunity to pull Dax back." A reasonable jury could interpret this testimony to mean that Forlenza's use of force against plaintiff did not involve an evaluation of the threat that plaintiff posed in the immediate circumstances where Forlenza encountered plaintiff.

Taking the facts in the light most favorable to plaintiff and after reviewing the BWC footage, the court concludes that a reasonable jury could find that plaintiff did not pose an immediate threat to officers or others and was not actively fleeing or resisting. A reasonable jury could believe plaintiff's testimony that he was standing with his hands showing waiting to be apprehended. While the background facts known to Forlenza spoke to plaintiff's potential danger, plaintiff's testimony and the BWC footage cut the other way. Viewing the record in the light most favorable to plaintiff, the court finds that a reasonable jury could find that plaintiff did not pose an immediate threat and was instead subdued and waiting to be apprehended.

### C. Warning

It is disputed whether Forlenza gave plaintiff a warning and opportunity for surrender.

10

This is a material fact because some courts have held that failure to give a warning before releasing a police dog is objectively unreasonable. See Bey v. Cimarossa, 202 F.3d 272 (table) (7th Cir. 2000) (noting that at least one circuit has held that "failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context.") (quoting Vathekan v. Prince George's County, 154 F.3d 173, 179 (4th Cir.1998)); see also Szabla v. City of Brooklyn Park, Minnesota, 486 F.3d 385, 391 (8th Cir. 2007) (explaining that "we held in 2004 that a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender"). Forlenza testifies that he "made several audible warning announcements." Plaintiff states that if Forlenza did provide a warning, it was inaudible. The BWC footage shows that Forlenza provided a single warning, but he did so while the dog was barking loudly. A reasonable jury could conclude that the warning was not audible and thus did not provide plaintiff with an opportunity to surrender.

### D. Degree of Control

The degree of control that Forlenza had over Dax is disputed. Forlenza states that while he maintained what he terms as "positive control," he did not have an opportunity to pull back his canine before it bit plaintiff. Plaintiff maintains that Forlenza could have pulled his canine back or issued an oral command to his canine to keep it from biting plaintiff. Based on the footage from the BWC, a reasonable jury could agree with either conclusion.

### E. Duration of bite

It is unclear whether Forlenza terminated the dog bite within a reasonable amount of time. Fundamentally, the use of force is "reasonable only when exercised in proportion to the

11

threat posed." Cyrus, 624 F.3d at 863. Therefore, "as the threat changes, so too should the degree of force." Id. While officers are not required "to alter the degree of force they use 'at the precise second' the threat changes," they are still bound by the general principle of proportionality. Snukis v. Taylor, 145 F.4th 734, 741 (7th Cir. 2025).

It is undisputed that the bite lasted approximately 42 seconds. Plaintiff maintains that at no point was he actively resisting. Forlenza testified that "I did believe he was physically resisting, actively resisting." Viewing the BWC footage in the light most favorable to plaintiff, a reasonable jury could find that plaintiff was not resisting arrest and instead find that plaintiff was attempting to comply with the officers' orders while being bitten. For almost the entire 42 seconds, two officers were on top of plaintiff while the canine sunk its teeth into plaintiff's leg. In between his cries of pain, plaintiff responded to the commands given to him by officers in the affirmative. Separate from whether plaintiff posed an imminent threat when Forlenza initially encountered him, a reasonable jury could find that the duration of the bite was unreasonably long in proportion to plaintiff's lack of resistance.

\*\*\*

In summary, defendants have failed to carry their burden to show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" on the excessive force claim. Fed. R. Civ. P. 56(a). As discussed above, there are genuine disputes as to the level of force employed, whether plaintiff posed an immediate threat, whether plaintiff was actively fleeing, whether Forlenza provided an audible warning, the degree of control Forlenza had over his canine, and whether Forlenza terminated the bite in a reasonable amount of time.

12

**Monell Claim**

Because defendants' argument for summary judgment on the Monell claim relies completely on the argument that "[w]ithout a constitutional violation, there is no Monell claim," defendants have also failed to carry their summary judgment burden on the Monell claim.

**Qualified Immunity**

Defendants have also failed to show that Forlenza is entitled to qualified immunity. To determine whether a defendant is entitled to qualified immunity, a court must determine: (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right was clearly established at the time of its alleged violation. See Bd. v. Farnham, 394 F.3d 469, 477 (7th Cir. 2005). The court has already determined that the facts alleged, taken in the light most favorable to plaintiff, show that Forlenza's conduct violated plaintiff's Fourth Amendment rights by using severe (or deadly) force to arrest him when he was subdued. Plaintiff was arrested in 2023. The Seventh Circuit has held that "prior to 2011 it was well-established that 'police officers cannot continue to use force once a suspect is subdued....[a]nd it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects.'" Becker, 821 F.3d at 928 (quoting Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 732 (7th Cir. 2013)). Thus, the right that Forlenza violated—again, taking the facts in the light most favorable to the plaintiff—was clearly established at the time of plaintiff's arrest.

\*\*\*

Finally, a note about Johnson v. Scott, 576 F.3d 658 (7th Cir. 2009), which defendants

13

argue "effectively decides this case."  There are key factual differences between <u>Johnson</u> and this case, including that the plaintiff in <u>Johnson</u> was a suspect in a shooting that had just occurred and the officer reasonably believed that he was armed with a deadly weapon.  576 F.3d at 659–60.  As discussed above, unlike in <u>Johnson</u>, here there is a genuine dispute of fact as to the immediate threat that plaintiff posed and as to whether Forlenza reasonably believed that plaintiff was armed.  The court will not catalogue the rest of the factual differences between <u>Johnson</u> and this case, instead reiterating that "[t]he nature and extent of the force that may reasonably be used to effectuate an arrest depends on the specific circumstances of the arrest."  <u>Cyrus</u>, 624 F.3d at, 861–62.  Defendants' argument overreads <u>Johnson</u> and fails to engage with the specific factual circumstances of the arrest here.  <u>Cf.</u> <u>Strand v. Town of Merrillville, Indiana</u>, No. 2:15 CV 149, 2018 WL 741625, at *4 (N.D. Ind. Feb. 7, 2018) (discussing "an overreaching application of" <u>Johnson</u> urged by defendants in that case), <u>aff'd sub nom.</u> <u>Strand v. Minchuk</u>, 910 F.3d 909 (7th Cir. 2018).

**CONCLUSION**

For the above reasons, defendants' motion for summary judgment (Doc. 46) is denied.  The parties are directed to file a joint status report using this court's form by July 20, 2026.  This matter is set for a telephonic hearing on July 23, 2026, at 9:15 a.m.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:   June 30, 2026**

14